# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

CHASE CALDWELL,                          )
                                         )
            Plaintiff,                   )
                                         )    CAUSE NO. 2:14-CV-455
      vs.                                )
                                         )
JESSE KLEMZ, WILLIAM KNAPP,              )
JAMIE EROW, and TIMOTHY BELL,            )
                                         )
            Defendants.                  )

## OPINION AND ORDER

This matter is before the Court on "Defendants Jesse Klemz, William Knapp, Jamie Erow, and Timothy Bell's Motion for Summary Judgment," filed by the defendants on April 1, 2016. (DE #164.) For the reasons set forth below, the motion is **GRANTED**. The clerk is **DIRECTED** to close this case.

BACKGROUND

The plaintiff, Chase Caldwell ("Plaintiff"), filed his *pro se* complaint in this matter on December 12, 2014, after an incident with officers from the Porter County Sheriff's Department (collectively, "Defendants"). (DE #1.) In it, Plaintiff alleged that he was assaulted and Tased by Jamie Erow ("Officer Erow") and was tackled and pushed by William Knapp ("Corporal Knapp").

According to Plaintiff, when he fled from those officers he was confronted by Timothy Bell ("Officer Bell") and Jesse Klemz ("Sergeant Klemz"), who eventually broke his right wrist. (*Id.* at 2-3.) Plaintiff purported to bring those claims pursuant to 18 U.S.C. section 241. (*Id.* at 2.) At the preliminary pretrial conference, it was determined that any motion for leave to amend the pleadings was to be filed by April 30, 2015, by Plaintiff and by May 15, 2015, by Defendants. (See DE #19.) The discovery deadline was set for December 1, 2015. (*Id.*)

On April 15, 2015, Plaintiff sought to amend his complaint in order to increase the amount of damages requested. (DE #23.) The motion was denied without prejudice by Magistrate Judge Paul R. Cherry for a variety or procedural defects. (DE #24.) Judge Cherry extended the deadline for filing a motion to amend the pleadings to May 9, 2015, for Planitiff and to May 22, 2015, for Defendants. Plaintiff refiled his motion to amend on April 27, 2015, and that motion was granted by Judge Cherry on June 5, 2015. (DE #26 & DE #35.) The amended complaint was docketed on June 10, 2015. (DE #40.) In it, Plaintiff requested additional monetary damages based on multiple injuries he suffered when Defendants allegedly punched him in the face, Tased him several times, and broke his right scaphoid. (*Id.* at 1.) Discovery commenced and was closed on December 1, 2015, without any requests to extend

that deadline. However, on November 30, 2015, one day prior to the close of discovery, Plaintiff filed a motion to amend the amended complaint, followed by a flurry of additional motions to amend. (DEs #127, #130, #131, #132, #133, #135, #136, #140.) On January 11, 2016, Judge Cherry granted the original motion to amend while denying the rest. (DE #145.)

The second amended complaint describes the alleged conduct of Defendants on February 18, 2014, and references 18 U.S.C. sections 241, 242, 245, and 249, as well as 42 U.S.C. section 14141, Article I, Section I of the Indiana Constitution, and Indiana Code 35-42-2-1(a)(C). (DE #147.) Specifically, Plaintiff alleges that:

> I was grabbed by Officer William Knapp after complying with police order to supply Identification. After fleeing from officers both William Knapp and Jamie Erow, followed me in their police marked vehicles to the entrance of property of The Courts of Northwest Indiana were I was assaulted by all four officers at 127 E US-6 Frontage Rd Valparaiso IN 46383 . . . . As stated in my original complaint all four officers used their electronic stun guns (taser) on my body which includes permanent scarring. Officers Timothy Bell and Jamie Erow grabbed me in rude insolent manner. I recall Officer William Knapp using his electronic stun gun (taser) on my genitals and stomach. I recall Officer Jesse Klemz punching me in the face several times and breaking my right wrist.[1]

---

[1] The Court has inserted the allegations verbatim without attempting to reference spelling or grammatical errors.

(*Id.* at 1, 5.)

On February 2, 2016, this Court set the dispositive motion deadline for April 1, 2016. (DE #155.) The following day, Plaintiff filed what he entitled an "Interrogatory to Plaintiff Chase Richard Caldwell." (DE #156.) On February 16, 2016, Defendants filed a motion to strike that interrogatory. (DE #160.) On March 25 and 30, 2016, Plaintiff filed two documents entitled "Plaintiff's Dispositive Motion," in which he requested that the Court strike the police report attached to Defendants' initial disclosures. (DE #161 & DE #162.) On April 1, 2016, Defendants filed a motion for summary judgment. (DE #164.) That same day, Defendants also served Plaintiff with a Notice of Summary Judgment. (DE #163.) On April 5, 2016, Plaintiff filed a response in opposition to that motion. (DE #166.) On April 15, 2016, Plaintiff filed a motion for leave to amend his pleadings before trial. (DE #167.) Defendants filed a reply in support of their motion for summary judgment on April 18, 2016, and a response in opposition to the motion to amend on April 21, 2016. (DE #168 & DE #169.) Subsequently, Plaintiff filed an additional motion for leave to amend his pleading, a memorandum in support of that motion, a reply and a corrected reply to Defendants' response in opposition to his motions to amend, and two additional memorandums

in support of his motions to amend.  (DEs #170, #171, #172, #173, #174, #175.)  On May 11, 2016, Defendants filed a motion to strike docket entries number 170 through 175.  (DE #176.)  Plaintiff filed a response to that motion two days later.  (DE #177.) Defendants filed a reply on May 19, 2016.  (DE #178.)  Plaintiff filed a sur-reply on May 23, 2016.  (DE #179.)  In an order dated September 2, 2016, the Court granted Defendants' motion to strike (DE #160) and struck the document entitled "Interrogatory to Plaintiff Chase Richard Caldwell" (DE #156), denied the "dispositive motions" filed by Plaintiff (DE #161 & #162), denied the motions for leave to amend filed by Plaintiff (DE #167 & #170), and denied Defendants' motion to strike.  (DE #176.)  The only motion remaining before the Court at this stage is Defendants' motion for summary judgment.  (DE #164.)

DISCUSSION

*Summary Judgment Standard*

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Not

every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* In determining whether summary judgment is appropriate, the deciding court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). "However, our favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (citing *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 306 (7th Cir. 2012)). A party opposing a properly supported summary judgment motion may not rely on allegations or denials in her own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). If the non-moving party fails to establish the existence of an essential element on which he or she bears the burden of proof at trial, summary judgment is proper. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).

While it is undisputed that *pro se* filings must be construed liberally, even *pro se* litigants must follow the rules of civil procedure. *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006)

(citing *McNeil v. United States*, 508 U.S. 106, 113 (1993)).  Non-compliance with local summary judgment rules may warrant a penalty -- the court is within its discretion to ignore facts a litigant has proposed that are not submitted in compliance with those rules. *Id.* (citing *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809-10 (7th Cir. 2005)).  In this district, Local Rule 56-1 mandates that the moving party must include a "Statement of Material Facts" in its supporting brief and that a party opposing a summary judgment motion must file a response brief (or appendix) that includes "a section labeled 'Statement of Genuine Disputes' that identifies the material facts that the party contends are genuinely disputed so as to make a trial necessary." N.D. Ind. L.R. 56-1(a),(b).  Local Rule 56-1 also imposes a duty upon a party seeking summary judgment against an unrepresented litigant to serve that party with a Notice of Summary-Judgment Motion ("Notice").  N.D. Ind. L.R. 56-1(f) (citing to Appendix C).  The Notice explains what a summary judgment motion is and what the responding party's obligations are with regard to the motion.  *Id*. The Notice includes copies of Federal Rule of Civil Procedure 56 and Local Rule 56-1 itself, which, together, provide that factual positions must be supported with citations to the record and that the court is not required to consider materials that are not cited. *Id*.  The Notice provides a warning that a failure to follow the

rules may result in an adverse ruling by the court. *Id*. The

Seventh Circuit has also made it clear that:

> [a] district court is not required to wade
> through improper denials and legal argument in
> search of a genuinely disputed fact. And a
> mere disagreement with the movant's asserted
> facts is inadequate if made without reference
> to specific supporting material. In short,
> judges are not like pigs, hunting for truffles
> buried in briefs.

*Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) (internal

quotation marks, brackets, and citations omitted). Thus, when a

non-movant fails to controvert a moving party's Statement of

Material Facts with a properly supported Statement of Genuine

Disputes, the movant's facts may be deemed admitted. *Id*. ("We

have consistently held that a failure to respond by the nonmovant

as mandated by the local rules results in an admission.").


*Material Facts*

Because Defendants provided Plaintiff with the required

Notice (DE #163), yet Plaintiff's response is devoid of a

"Statement of Genuine Disputes" or citations to the evidence,[2] the

well-supported facts presented by Defendants are considered

---

2  Plaintiff has attached 256 pages of documents labeled exhibits A-G but
fails to properly cite to any disputed facts. That said, the Court has
reviewed the documents as discussed below and finds that none of the evidence
that is presented would serve to establish a material disputed fact.

undisputed and will be accepted as true.[3]  *Smith*, 321 F.3d at 683;

see also *Timms v. Frank*, 953 F.2d 281 (7th Cir. 1992).  The facts[4]

are as follows:  On February 18, 2014, Officer Erow was dispatched

to 127 E. U.S. Highway 6, the location of a private commercial

sports facility called The Courts of Northwest Indiana ("The

Courts"), in response to a male subject running on the courts,

refusing to leave, and talking to himself.  Officer Erow spoke

with the complainant and the building owner regarding the

individual.  Officer Erow learned that the individual, whom they

had never seen before, was running back and forth on the courts,

talking to himself, and harassing a softball team.  The individual

had refused to leave the facility when asked.  Officer Erow then

spoke with the individual, whom she later identified as Plaintiff,

and asked him if he had paid the required entrance fee.  Plaintiff

replied that he did not know he had to pay, so Officer Erow

explained to him that he either had to pay the fee or leave because

The Court's management felt he was disturbing the other patrons.

Corporal Knapp arrived on the scene while Officer Erow was speaking

with Plaintiff.  Corporal Knapp heard Plaintiff say several times

---

3  Defendants have submitted sworn affidavits from each officer and medical
records from Porter Regional Hospital.  (See DE #165-1 through DE #165-5.)

4 Having verified that the cited evidence supports each of the facts
presented in Defendants' brief, the facts in this section are borrowed from
the brief (DE #165) with only minor alterations.

that he should not have to pay the fee, so he intervened at that point and told Plaintiff that he could either leave or be charged with criminal trespass.  Plaintiff gathered his belongings and left The Courts.

Once outside, Officer Erow asked Plaintiff to produce his identification because she intended to issue him a trespass warning, and Plaintiff handed over his Indiana Driver's License. As Officer Erow was providing Plaintiff's information to dispatch, he started walking away and stated that he "had to go" and that he was "going to his car."  Officer Erow asked Plaintiff to wait for her to finish running his information, but Plaintiff did not acknowledge her and kept walking.  According to Corporal Knapp, Plaintiff attempted to walk directly through him as if he was not even there.  Corporal Knapp put up his left hand to prevent Plaintiff from crashing into him.  Corporal Knapp then asked Plaintiff to stand still and wait until they were done running his Driver's License, but Plaintiff did not acknowledge Corporal Knapp and continued to insist that he needed to go find his car. Corporal Knapp repeated his request that Plaintiff remain still, but Plaintiff proceeded to walk directly into Corporal Knapp, striking him with his shoulder in the process.  As a result, Corporal Knapp asked Plaintiff to place his hands on top of Officer Erow's vehicle.  Plaintiff ignored the request, so Corporal Knapp

grabbed Plaintiff's right wrist and placed his hand on the hood of Officer Erow's vehicle. Plaintiff pulled his right arm free, dropped all of his belongings on the ground, and began to run away from Corporal Knapp and Officer Erow.

After running a short distance, Plaintiff returned to where Officer Erow and Officer Knapp were standing. Due to Plaintiff's behavior and the fact that he had struck Corporal Knapp with his shoulder, Corporal Knapp advised Plaintiff that he was going to place him in handcuffs for safety purposes until the encounter was complete. Before Corporal Knapp touched him, Plaintiff became aggressive and started yelling, "Why are you trying to hurt me?" Corporal Knapp attempted to grab Plaintiff's right arm and wrist to place him in handcuffs, but before Corporal Knapp could get his handcuffs out, Plaintiff yanked his arm away. In the same motion, he turned to engage Corporal Knapp physically by using his hands to push off and away from him, which knocked Corporal Knapp to the ground. Corporal Knapp reached up to grab Plaintiff's jacket sleeve, but Plaintiff twisted his arm away and out of his coat.

Officer Erow was able to see the struggle between Plaintiff and Corporal Knapp from where she was standing. When Officer Erow saw Corporal Knapp on the ground, she drew her Taser in a display of force. Officer Erow saw Plaintiff starting to run away as Corporal Knapp grabbed Plaintiff's jacket sleeve. Both Officer

Erow and Corporal Knapp yelled verbal commands at Plaintiff to stop, but he did not comply. Officer Erow then deployed her Taser. One of the Taser probes made contact with Plaintiff's left lower back, but Plaintiff pulled free from his jacket, ripped off the probe, and proceeded to run away. Officer Erow and Corporal Knapp repeated their verbal commands for Plaintiff to stop, but he continued to flee. In light of Plaintiff's behavior, Officer Erow believed that Plaintiff presented a safety threat to officers, the public, and to himself.

Corporal Knapp followed Plaintiff on foot as he ran across the parking lot, through knee deep snow, and over into neighboring properties. Corporal Knapp repeatedly ordered Plaintiff to stop running and come towards him, but Plaintiff ignored those commands. Corporal Knapp chased Plaintiff for approximately two-tenths of a mile, issuing commands for Plaintiff to stop the whole time. When Corporal Knapp observed Plaintiff hiding behind a tree at a neighboring residence, he gave Plaintiff verbal commands to surrender and come towards him with his hands visible. Plaintiff ignored those commands and turned to run through the snow back onto the driveway of The Courts.

While Corporal Knapp pursued Plaintiff on foot, Officer Erow returned to her patrol vehicle and proceeded down the driveway of The Courts towards an access road for neighboring homes. She

heard over the radio that Corporal Knapp had lost Plaintiff. Officer Erow spotted Plaintiff running away from a residence near the access road. She then witnessed Plaintiff change directions and head towards the access road where she was positioned. Officer Erow attempted to cut Plaintiff off with her vehicle, but he veered away in a different direction and headed through the snow covered area. Officer Erow exited her vehicle to pursue Plaintiff on foot. As she was doing so, she repeatedly gave Plaintiff verbal commands to stop and get on the ground. Plaintiff ignored those commands and continued running.

Officer Bell arrived on the scene and saw Officer Erow pursuing Plaintiff on foot near the access roads to The Courts. Officer Bell could hear Officer Erow yelling the verbal commands at Plaintiff. Officer Bell got out of his vehicle and started running down the driveway of The Courts in order to attempt to cut Plaintiff off, but Plaintiff abruptly changed direction and headed back onto the snow covered are between the access road and the driveway, away from both Officer Bell and Officer Erow.

As he ran, Officer Bell repeatedly yelled at Plaintiff to stop. Because Plaintiff refused to comply with his commands and those of Officer Erow, Officer Bell drew his Taser, turned it on, and aimed it at Plaintiff in a display of force. Officer Bell continued to yell loud and clear commands for Plaintiff to stop.

13

Plaintiff slowed to a walk and proceeded towards Officer Bell, but as he approached, Plaintiff quickly side-stepped Officer Bell and proceeded to run away again. When Plaintiff was approximately seven to nine feet away from him, Officer Bell deployed his Taser, and the probes made contact with Plaintiff's lower abdomen.

According to Officer Bell, the Taser appeared to have no effect on Plaintiff, who continued to ignore the commands to stop and proceeded to rip out the probes. Officer Bell closed the distance between them and attempted to apply the Taser in drive stun mode to Plaintiff's back. Officer Bell did so because, based on his training and experience, he believed applying the Taser probes in drive stun mode would complete the electrical circuit and ensure that a connection was made with Plaintiff. While the Taser in drive stun mode appeared to slow Plaintiff down a little, it did not stop him, and he continued moving away.

However, civilian traffic hindered Plaintiff's ability to continue to run down the driveway, and Officer Erow and Officer Bell were able to close the gap to get in position on either side of Plaintiff. As they closed in, Officer Bell and Officer Erow repeated requests for Plaintiff to calm down. When they attempted to gain control of Plaintiff's arms, he began aggressively kicking, swinging his arms, and striking both officers. Officer Erow and Officer Bell continued to request that Plaintiff calm down and

14

ordered him to stop resisting.  When Officer Bell attempted to grab Plaintiff's left arm/shirt area to stop him from pulling away and striking the officers, Plaintiff responded by using an open-handed strike to hit Officer Bell in the face, which caused him pain.

Corporal Knapp headed towards the group and was able to hear Officer Erow and Officer Bell repeatedly give Plaintiff verbal commands to calm down and stop resisting.  He was also able to see Plaintiff kicking, swinging his arms, and striking Officer Bell and Officer Erow.  When Corporal Knapp got close enough to the group, he began issuing verbal commands as well, but Plaintiff ignored those commands.  As a result, Corporal Knapp deployed his Taser, and the probes struck Plaintiff's lower abdomen.  Because the Taser probes appeared to be ineffective, Corporal Knapp proceeded to apply the Taser in drive stun mode to Plaintiff's back area to ensure a connection was made.  According to Corporal Knapp, the Taser did not appear to have any effect on Plaintiff who continued kicking, swinging his arms, and striking Officer Erow and Officer Bell.

In order to attempt to get Plaintiff to comply with the repeated requests to calm down and stop resisting, Corporal Knapp

applied a bilateral vascular restraint on Plaintiff.[5]  The application of this restraint allowed Officer Erow, Officer Bell, and Corporal Knapp to get Plaintiff on the ground in a seated position.  Corporal Knapp released the restraint at that point so the officers could attempt to roll Plaintiff onto his stomach to be handcuffed.  However, once the pressure was removed, Plaintiff began to kick and hit the officers again.

Sergeant Klemz arrived on the scene and observed Corporal Knapp, Officer Erow, and Officer Bell physically struggling on the ground to gain control of Plaintiff's arms and legs as he kicked, hit, flailed uncontrollably, and struck all three officers with his hands, feet, and fists.  Sergeant Klemz heard the officers yell commands for Plaintiff to calm down and stop resisting, but he refused to obey and continued to kick and push the officers away.  As Sergeant Klemz approached, one of the officers informed him that the three earlier Taser deployments seemingly had no effect on Plaintiff, who was exhibiting abnormal strength, a high pain tolerance, and senseless chatter.  As such, Sergeant Klemz decided to use an alternative method to subdue Plaintiff, and he attempted to strike a nerve point located in the side of Plaintiff's neck in order to briefly stun him and allow time for

---

5  According to Corporal Knapp, this restraint is conducted by applying pressure on both sides of the neck.

the officers to place him in handcuffs.  However, because
Plaintiff continued to erratically flail his head about, Sergeant
Klemz' hand inadvertently made contact with the side of Plaintiff's
face near his jaw instead of the nerve point in his neck, so
Sergeant Klemz was unable to subdue Plaintiff utilizing that
method.

Sergeant Klemz was able to gain control of Plaintiff's left
arm though, and Officer Erow placed one handcuff on his left wrist.
Plaintiff continued to kick, swing, and strike all of the officers
during this process, and he ignored the repeated commands to calm
down and stop resisting.  Officer Erow was eventually able to get
the remaining handcuff onto Plaintiff's right wrist.  However, due
to Plaintiff's flailing body movements, the cuffs were placed in
front rather than behind his back.  At no point while the officers
were attempting to handcuff Plaintiff did he advise them that he
was in any pain or that the handcuffs were too tight.
Additionally, Plaintiff never made any comments about any injury
or pain to his wrist during the encounter.

Once Plaintiff was handcuffed, he was restrained on the ground
until the EMS arrived, and he was transported to Porter Regional
Hospital moments later.  Plaintiff was seen by medical staff for
a physical and mental evaluation.  Upon assessment, Plaintiff was
found to have scrapes and abrasions on his shoulder and neck area,

abrasions on his stomach and the back side of his right upper arm, and a small hematoma on his right temple.[6]  When asked, Plaintiff informed the hospital staff that he had no pain, and it was noted that there was "no obvious deformities to any extremities . . . only abrasions and a small hematoma on his right temple."[7] Plaintiff was diagnosed with a psychotic disorder and held for a mental health commitment.[8]

*Analysis*

A plaintiff may bring a cause of action under 42 U.S.C. section 1983 against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.  In order to prevail on a section 1983 claim, a plaintiff must show that he "was deprived of a right secured by the Constitution or federal law" "by a person acting under color of law."  *Thurman v. Vill. of*

---

6  (DE #165-5, pp. 4, 15.)

7  (DE #165-5, p. 4.)

8  (See generally DE #165-5.)

*Homewood*, 446 F.3d 682, 687 (7th Cir. 2006).


Fourth Amendment - Excessive Force Claims

Excessive force claims brought against law enforcement officers which stem from an arrest, investigatory stop, or other seizure of a citizen are analyzed under the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Abdullahi v. City of Madison*, 423 F.3d 763, 768 (7th Cir. 2005). The Court must look at the totality of the circumstances to determine if the governmental interests during the encounter outweighed the intrusion upon the citizen's constitutional rights. See *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 861 (7th Cir. 2010) (quoting *Jacobs v. City of Chicago*, 215 F.3d 758, 773 (7th Cir. 2000)). Whether the type of force used was reasonable depends on the specific details of each arrest, and factors to be considered include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Cyrus*, 624 F.3d at 861-62 (quoting *Graham*, 490 U.S. at 396).

> The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The question is whether the officers' actions are

> objectively reasonable in light of the facts
> and circumstances confronting them, without
> regard to their underlying intent or
> motivation.

*Tibbs v. City of Chicago,* 469 F.3d 661, 665 (7th Cir. 2006)

(internal quotations marks, brackets, and citations omitted). The

Seventh Circuit has recognized that a person has a right to be

free from intentional infliction of pain during law enforcement

handcuffing incidents; however, "a reasonable officer cannot be

expected to accommodate an injury that is not apparent or that

otherwise has not been made known to him." *Stainback v. Dixon*,

569 F.3d 767, 773 (7th Cir. 2009).

Defendants contend that summary judgment should be granted on

Plaintiff's excessive force claims because it is undisputed that

Defendants acted reasonably with regard to their treatment of him

during the encounter at The Courts. Plaintiff responds by

referencing photographs of his wrist and a scar on his stomach,

pointing to medical documents related to doctor visits that began

in May of 2014 (nearly three months after the incident at The

Courts), and reiterating the allegations in his second amended

complaint with regard to Defendants' use of force during the

arrest.[9] However, as noted above, Plaintiff's response brief fails

---

9 Plaintiff also seems to argue that Defendants' summary judgment motion was
untimely, but this argument is frivolous as it was filed by the dispositive
motion deadline set by this Court. (See DE #155.) Additionally, Plaintiff

to comply with the Local Rules and does not properly cite to admissible evidence that would support his claims; of note, he has not submitted a sworn affidavit detailing his version of events. In essence, Plaintiff has provided no admissible evidence to create a genuine dispute that would be relevant to proceeding with these claims.  See *United States v. 5443 Suffield Terrace*, *Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010) ("At summary judgment, unfortunately for [the plaintiff], saying so doesn't make it so; summary judgment may only be defeated by pointing to admissible evidence in the summary judgment record that creates a genuine issue of material fact, and it was not the district court's job to sift through the record and make [the plaintiff's] case for him."); *Sow v. Fortville Police Dep't*, 636 F.3d 293, 300 (7th Cir. 2011)

---

states that he was "arrested and later transported to Porter Starke Services before an arrest warrant was filed" and that he was a "victim of involuntary mental treatment at Porter Regional Hospital." (DE #166, p. 2.)  He references the arrest warrant and his medical records at Exhibits E, F, and G.  (*Id.*)  In the closing section of his response brief, he states, without elaboration, that Defendants "used excessive force, unlawful arrests, and false arrest of Plaintiff Chase Richard Caldwell." (*Id.* at 3.)  However, as noted by Defendants in their reply brief, Plaintiff's second amended complaint does not allege any false arrest claims, even construing it liberally (nor, for that matter, do the original or first amended complaint). See *Carver v. Condie*, 169 F.3d 469, 472 (7th Cir. 1999) ("Once the amended complaint was filed . . . it became the governing document in the case and any allegations ... not brought forward fell by the wayside.").  The Court finds that it is too late for Plaintiff to amend his second amended complaint at this stage, so these claims cannot proceed.  See *Conner v. Illinois Dept. of Nat. Resources*, 413 F.3d 675, 679-80 (7th Cir. 2005) (a passing reference in a response brief is not a proper way to amend a complaint); *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002) (a plaintiff "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment").

("In a § 1983 case, the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and must present sufficient evidence to create genuine issues of material fact to avoid summary judgment."); *Tibbs*, 469 F.3d at 663 n. 2 (mere allegations in a complaint and unsupported assertions in a response brief need not be considered).

The Seventh Circuit has stated:

> When material facts are in dispute, then the case must go to a jury, whether the argument is that the police acted unreasonably because they lacked probable cause, or that they acted unreasonably because they responded overzealously and with too little concern for safety. But when material facts (or enough of them to justify the conduct objectively) are undisputed, then there would be nothing for a jury to do *except* second-guess the officers, which *Graham* held must be prevented. Since *Graham* we have regularly treated the reasonableness of force as a legal issue, rather than an analog of civil negligence. This appears to be the accepted rule; the [plaintiffs] do not cite, and we could not find, any post-*Graham* appellate opinion holding that the reasonableness of using force is a jury question even if no factual disputes require resolution.

*Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003) (emphasis in original, citations omitted). We are left with the undisputed facts set forth in the preceding section, and the question now before the Court is "whether the totality of the circumstances" justified Defendants' actions. *Graham*, 490 U.S. at 396. It is

undisputed that the individual Defendants used varying degrees of force during the arrest. However, when viewed in totality, the Court finds that the conduct of each Defendant was objectively reasonable. While the nature of the initial crime (alleged criminal trespassing) was not in and of itself particularly severe, the situation soon escalated, and it became clear that Defendants were faced with an individual who repeatedly refused to comply with directives, actively resisted arrest, became increasingly physically combative throughout the encounter, was exhibiting abnormal strength, a high pain tolerance, and senseless chatter, and presented a safety threat to the officers, the public, and himself.

At the time Corporal Knapp first made physical contact with Plaintiff by grabbing his wrist and placing his hand on the hood of Officer Erow's vehicle, Plaintiff had already ignored repeated requests to remain in place while his identification was being run for purposes of issuing him a trespass warning, had struck Corporal Knapp with his shoulder while attempting to walk away, and had ignored commands to place his hands on the vehicle. Other than Plaintiff's unsupported assertion that he was "grabbed by Corporal Knapp after supplying his identification," there is nothing in the record to show that this type of minimal physical coercion used on an uncooperative individual was excessive, as it is clear that not

every push or shove violates the Fourth Amendment. *Graham*, 490

U.S. at 396; *Fitzgerald v. Santoro*, 707 F.3d 725, 734 (7th Cir.

2013) (use of "minimally forceful techniques designed to subdue

non-compliant subjects and prevent escalation" was not excessive).

Similarly, when Plaintiff subsequently twisted his arm free and

began to run away, Corporal Knapp's attempt to grab Plaintiff's

right arm in order to place him in handcuffs for safety and

compliance purposes until the encounter was complete was

objectively reasonable. *Id*.

It is undisputed that the situation deteriorated quickly

thereafter. Plaintiff yanked his arm away, pushed off of Corporal

Knapp which knocked the officer to the ground, twisted out of his

coat, and began to run away despite commands to stop. Officer

Erow then deployed her Taser once, which had no effect on Plaintiff

who continued to flee through an area that included a residence

and civilian traffic, while ignoring repeated commands to stop.

When Officer Bell arrived on the scene and witnessed the foregoing,

he joined the chase on foot, issued repeated commands of his own

which Plaintiff also ignored, and eventually deployed his Taser

making contact with Plaintiff's lower abdomen before applying it

in drive stun mode to Plaintiff's back. The Taser had little

effect on Plaintiff who persisted in fleeing. When Officers Erow

and Bell were finally able to close in on him, Plaintiff actively

resisted arrest and began kicking, swinging his arms, and striking them. Corporal Knapp witnessed this when he approached, issued repeated verbal commands to Plaintiff to cease resisting, and then deployed his Taser in the same manner as Officer Bell.[10] The Taser had no effect on Plaintiff who continued kicking, swinging, and lashing out. In light of the repeated attempts at flight and increasing level of resistance and aggression shown by Plaintiff, the Court finds that the use of force by each Defendant was objectively reasonable when viewing the circumstance as a whole. The Tasers were not deployed simultaneously or in rapid succession; rather, each officer evaluated the situation as it unfolded and applied measured force in order to attempt to de-escalate the rapidly changing and potentially dangerous encounter. Not only was Plaintiff refusing verbal commands by continuing to flee towards a residence and among civilian traffic, but he became physically violent towards the officers when apprehended. As such, it is clear that the responses by Defendants were within legally acceptable bounds. See *Smith v. Ball State Univ.*, 295

---

10  In his response brief, Plaintiff states that Corporal Knapp admitted via his interrogatories that he Tased Plaintiff in his genitals. This is an inaccurate statement of the record, as Corporal Knapp specifically denied using his Taser on Plaintiff's genitals. (See DE #166-1, p. 108.) Plaintiff also states that "all four officers used their electronic stun guns on my body, and all four defendants admit to it in Exhibit D," but this is also an inaccurate statement of the record, as Sergeant Klemz does not admit to using a Taser on Plaintiff in his interrogatory. (See DE #116-1, pp. 119-122.)

F.3d 763, 770 (7th Cir. 2002) ("When police officers face what is essentially a fluid situation, they are entitled to graduate their response to meet the demands of the circumstances confronting them."); see also *Clarett v. Roberts*, 657 F.3d 664, 674–75 (7th Cir. 2011) (affirming jury verdict for officer who Tased a non-compliant suspect three times in an attempt to avoid a greater physical altercation); *U.S. v. Norris*, 640 F.3d 295, 303 (7th Cir. 2011) (officer's use of Taser to subdue a suspect was reasonable because the suspect had shown an "unwillingness to accede to reasonable police commands, and his actions suggested an intent to use violence to fend off further police action").

When it became clear that the Tasers were not sufficient to subdue Plaintiff who appeared to be exhibiting abnormal strength and an unusually high pain tolerance, Corporal Knapp and Sergeant Klemz attempted to use alternative methods of force to keep Plaintiff from injuring the other officers and/or himself. Corporal Knapp applied pressure to both sides of Plaintiff's neck for compliance purposes but released the pressure as soon as the other officers were able to gain some control over Plaintiff's arms. Unfortunately, the control was short lived as Plaintiff began resisting again almost immediately. Similarly, Sergeant Klemz tried to make contact with the nerve points located in the side of Plaintiff's neck twice in order to subdue him, but once he

realized that Plaintiff's movements were too erratic to ensure correct contact, he ceased trying. The record indicates that both the pressure applied by Corporal Knapp and the strikes administered by Sergeant Klemz were measured and not performed in a gratuitous manner. Thus, while neither Corporal Knapp's bilateral vascular restraint nor Sergeant Klemz' stunning technique were ultimately successful, the attempts were objectively reasonable in light of the fact that the previous use of Tasers had failed yet Plaintiff was still actively resisting arrest. See *Padula v. Leimbach*, 656 F.3d 595, 603 (7th Cir. 2011) (baton strikes that were "'stern,' but not 'severe'" were objectively reasonable in response to kicking and flailing of plaintiff).

Finally, it is undisputed that Plaintiff was ultimately handcuffed by Defendants. Sergeant Klemz and Officer Erow were able to cuff Plaintiff's wrists one at a time, but they had to do so in front of his body as opposed to behind his back because Plaintiff continued to kick, flail, and strike them during the cuffing process. While Plaintiff argues that Sergeant Klemz broke his right wrist, there is no evidence in the record to support this claim.[11] As pointed out by Defendants, Plaintiff has not

---

11  As noted above, Plaintiff has not properly cited to any admissible evidence that would create a genuine dispute. That said, the Court has gone through the record and notes that Plaintiff's Exhibit A (DE #166-1, pp. 1-7) contains photographs of a hand that appears to have some bruising and

presented any admissible evidence showing he complained of pain or injury to his wrist while he was being handcuffed, and there is no indication that the handcuffs were applied improperly. Furthermore, the hospital records confirm Plaintiff advised the medical staff he was in no pain upon arrival at the hospital and they further note that there were "no obvious deformities to any extremities . . . only abrasions and a small hematoma on his right temple."[12] Considering Plaintiff's behavior leading up to the handcuffing and the fact that Plaintiff failed to complain of pain or injury, it was objectively reasonable for Sergeant Klemz and Officer Erow to handcuff Plaintiff in the manner in which they attest. See *Howell v. Smith*, 853 F.3d 892, 899 (7th Cir. 2017)

abrasions; however, the photographs were allegedly taken the day *after* the incident at The Courts, and the medical records establish that Plaintiff was in restraints during his hospital stay (DE #165-5, pp. 4, 19). It is not clear, based on the photographs alone, whether those injuries were inflicted during the initial handcuffing or during the time he was restrained in the hospital. Either way, this evidence does not establish Plaintiff's wrist was broken by Defendants. While Exhibit B (DE #166-1, pp. 8-104) contains medical records from Lakeshore Bone & Joint Institute showing a diagnosis of and treatment for a fractured wrist, Plaintiff admits that he did not begin treating with Lakeshore Bone & Joint until May 22, 2014, which was several months after the events in question. The Court agrees with Defendants that Plaintiff has not created a genuine dispute related to causation that would preclude summary judgment. Moreover, even if it could be established that an injury to his wrist did occur while in police custody, Plaintiff's unsupported assertions in his response brief that Sergeant "twisted his wrist" is insufficient. See *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 864 (7th Cir. 2010) ("[A] plaintiff cannot ask a jury to infer that an officer used excessive force based solely on the fact that an injury occurred. The plaintiff must instead identify the specific conduct of the officer that is alleged to be excessive and unreasonable; the fact of an injury while in police custody is not enough.)

12 (DE #165-5, p. 4; see also DE #165-5, p. 15 - diagram showing no abrasions or other injuries on Plaintiff's wrist.)

(finding that officer did not use excessive force because he had only "minimal and nonspecific information about the extent to which the handcuffs were causing distress and injury"); *Rooni v. Biser*, 742 F.3d 737, 742 (7th Cir. 2014) ("A person has the right to be free from an officer's knowing use of handcuffs in a way that would inflict *unnecessary* pain or injury, *if* that person presents little or no risk of flight or threat of injury.") (emphasis added); *Tibbs*, 469 F.3d at 666 (excessive force claim dismissed because plaintiff complained the handcuffs were on too tight but did not indicate the degree of pain).

Thus, because all force used by Defendants during the encounter on February 18, 2014, was objectively reasonable in light of the totality of the circumstances, Defendants are entitled to summary judgment on Plaintiff's Fourth Amendment excessive force claims as a matter of law.

Federal Criminal Statutes & Conspiracy Claims

Plaintiff's second amended complaint references several federal criminal statutes, namely 18 U.S.C. sections 241, 242, 245, and 249. Defendants argue that Plaintiff cannot sustain any claims brought pursuant to the aforementioned statutes because private citizens cannot compel the enforcement of criminal laws. Plaintiff has not responded to this argument. The Court agrees

with Defendants that these federal criminal statutes do not provide a private cause of action for civil liability. See e.g. *Ragsdale v. Turnock*, 941 F.2d 501, 509 (7th Cir. 1991) (in general, our legal system provides no right for private persons to enforce criminal statutes); *Weiland v. Byrne*, 392 F. Supp. 21, 22 (N.D. Ill. 1975) (plaintiff has no standing to sue under criminal statutes including 18 U.S.C. §§ 241, 242); see also *Andrews v. Heaton*, 483 F.3d 1070, 1076 (10th Cir. 2007) (criminal statutes that do not provide a private right of action are not enforceable via a civil lawsuit).

To the extent that Plaintiff's second amended can be construed liberally as attempting to bring a civil conspiracy claim under section 1983,[13] the Court notes that "conspiracy is not an independent basis of liability in [section] 1983 actions." *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008); see also *Goldschmidt v. Patchett*, 686 F.2d 582, 585 (7th Cir. 1982) ("Section 1983 does not, however, punish conspiracy; an actual denial of a civil right is necessary before a cause of action arises."). The purpose of the doctrine is "merely to yoke particular individuals to the specific torts charged in the complaint." *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988). To establish a civil

---

13  Plaintiff cites to the federal criminal conspiracy statute at 18 U.S.C. section 241.

conspiracy, a plaintiff must show that a defendant voluntarily participated in a common venture and understood, accepted, and agreed to further the general objectives of the scheme. *Id*. Speculative evidence cannot be used to prove its existence. *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003). Here, not only has Plaintiff failed to establish that his rights were violated (constitutionally or otherwise), but he has also failed to produce any evidence whatsoever that an agreement sufficient to sustain a conspiracy existed between Defendants. Summary judgment is warranted on all of these claims.

Discrimination Claims

Plaintiff's second amended complaint contains a boilerplate section taken from Title II of the Civil Rights Act of 1964, 42 U.S.C. section 2000a, *et seq*. ("Title II"). Defendants argue that, while it is unclear exactly what type of claim Plaintiff is intending to pursue, there is no evidence in the record to sustain any type of discrimination claim. Plaintiff has not responded to this argument. Title II prohibits discrimination or segregation in places of public accommodation. See generally 42 U.S.C. § 2000a. As an initial matter, the Court notes that a Title II plaintiff must comply with certain written notice provisions before filing suit in federal court. *Stearnes v. Baur's Opera*

*House Inc.*, 3 F.3d 1142, 1145 (7th Cir. 1993). Section 2000a–3(c) requires that, if one is available, the appropriate state agency must be given "written notice" of the "alleged act or practice" at least 30 days before a federal action is brought. 42 U.S.C. § 2000a-3(c). A "failure to notify the appropriate state agency when one exists dooms a Title II plaintiff's case." *Stearnes*, 3 F.3d at 1145. Indiana has a statute prohibiting discrimination in the use of public accommodations[14] and has established a state authority, the Indiana Civil Rights Commission ("ICRC"), from which to seek relief.[15] As such, Plaintiff was required to notify the ICRC prior to filing any Title II claims in the instant lawsuit. Because he has submitted no evidence that he has complied with the notice provisions, this Court lacks jurisdiction over Plaintiff's Title II discrimination claims, and they must be dismissed.[16] See *Id*.

---

14  See Ind. Code § 22-9-1-2 (classifying equal access to public conveniences and accommodates as a civil right and declaring that "[t]he practice of denying these rights to properly qualified persons by reason of the race, religion, color, sex, disability, national origin, or ancestry of such person is contrary to the principles of freedom and equality of opportunity and is a burden to the objectives of the public policy of this state and shall be considered as discriminatory practices").

15  Indiana Code section 22-9-1-4 establishes the ICRC, and under Indiana Code section 22-9-1-6, the ICRC is empowered to receive, investigate, and adjudicate complaints alleging discriminatory practices.

16  Moreover, even if Plaintiff had provided the ICRC with timely notice, there is no evidence in the record to support any type of discrimination claim against the individual officer Defendants. Assuming, *arguendo*, that Defendants could somehow be held responsible under Title II for Plaintiff's

Pattern or Practice Claims

The second amended complaint contains a reference to 42 U.S.C. § 14141,[17] which makes it unlawful for any person acting on behalf of a governmental authority to engage in a practice or pattern of conduct that deprives juveniles of their constitutional rights. Defendants point out that Plaintiff was not a juvenile at the time of the events in question and could not bring a civil claim under the statute even if he was. Plaintiff responds by pasting a section of the statute into his brief and arguing in full that "[a]ll citing of admissible evidence contained within Exhibits A-G show the defendants' Officer William Knapp, Jesse Klemz, Jaime Erow, and Timothy Bell used excessive force, unlawful arrests, and false arrest of Plaintiff Chase Richard Caldwell." (DE #166, p. 3.) However, as pointed out by Defendants, Plaintiff (who was not

_____

ejection from The Courts, the undisputed evidence establishes that Plaintiff was asked to leave because he refused to pay the entrance fee, not because of his race, color, religion, or national origin. See 42 U.S.C. § 2000a (prohibiting discrimination in places of public accommodation "*on the ground of* race, color, religion, or national origin") (emphasis added). There is simply no evidence to the contrary. Furthermore, Plaintiff seeks only monetary damages, and Title II does not provide for monetary relief. See *Petrovic v. Enter. Leasing Co. of Chicago, LLC*, 513 Fed. Appx. 609, 611 (7th Cir. 2013) (citing *Newman v. Piggie Park Enter., Inc.*, 390 U.S. 400, 402 (1968)).

17  42 U.S.C. § 14141 was transferred to 34 U.S.C. § 12601, effective September 1, 2017.

a juvenile at the time of the events in question)[18] has failed to provide even a scintilla of evidence that a pattern or practice of such conduct existed. Moreover, section 14141 does not confer a private right of action under which to sue. See *Rangel v. Reynolds*, 607 F. Supp. 2d 911, 925, n. 6 (N.D. Ind. 2009) (only Department of Justice may file suit for violations of the statute). Summary judgment is warranted on these claims.

State Law Tort Claims

The second amended complaint cites to the Indiana criminal battery statute[19] and references Plaintiff's physical and emotional distress allegedly caused by the encounter at The Courts. Defendants argue that any state law tort claims are barred because Plaintiff failed to file a timely notice as required by the Indiana Tort Claims Act ("ITCA"). Plaintiff has failed to respond to this argument. The ITCA governs lawsuits initiated against a political subdivision and its employees. *Fowler v. Brewer*, 773 N.E.2d 858, 861 (Ind. App. 2002). Under the ITCA, employees are immunized for conduct that falls within the scope of their employment. *Id*. "The purpose of the ITCA is to ensure that public employees can

---

18  See DE #165-5, p. 1 (Plaintiff's birthdate listed as 7/7/1991 and age listed as 22).

19  See I.C. § 35-42-2-1(1)(a)(C).

exercise their independent judgment necessary to carry out their duties without threat of harassment by litigation or threats of litigation over decisions made within the scope of their employment." *Id*. at 861-62 (citation omitted). To that end, providing early notice that a claim exists is required by a party wishing to bring suit. *Id*. at 861. Indiana Code section 34-13-3-8 states that such suits are barred unless notice is filed with (1) the governing body of that political subdivision; and (2) the Indiana Political Subdivision Risk Management Commission within 180 days after the loss occurs. See *Brown v. Alexander*, 876 N.E.2d 376, 380-85 (Ind. Ct. App. 2007). "The notice requirements of the ITCA apply not only to suits against political subdivisions but also to suits against employees of political subdivisions." *Davidson v. Perron*, 716 N.E.2d 29, 33-34 (Ind. App. 1999). If a defendant raises the failure to comply with the ITCA's notice provisions as an affirmative defense, the burden shifts to the plaintiff to prove compliance. *Id*. at 34. Summary judgment is appropriate if the plaintiff fails to meet this burden. See *Alexander v. City of S. Bend*, 256 F. Supp. 2d 865, 875 (N.D. Ind. 2003).

Defendants raised Plaintiff's failure to submit a timely ITCA notice in their answer[20] and again in the instant motion. It is undisputed that Defendants were acting within the scope of their employment during the encounter with Plaintiff on February 18, 2014, so the ITCA's notice requirements apply. See e.g. *Reiner v. Dandurand*, 33 F. Supp. 3d 1018, 1032 (N.D. Ind. 2014) ("If an alleged action is within the general scope of an individual's authority, it is authorized within the meaning of the Tort Claims Act, regardless of whether it was done negligently or with improper motive. The actions of pulling someone over, arresting him, etc. are within the general scope of a police officer's authority under the law.") (internal quotation marks and citation omitted). It is also undisputed that Plaintiff has not provided any evidence that he submitted a notice in compliance with the ITCA to date. Thus, summary judgment is appropriate on all of Plaintiff's state law tort claims.

Indiana Constitutional Claims

Finally, Plaintiff's second amended complaint references the Indiana Constitution. Defendants argue that, to the extent Plaintiff is premising any of his claims upon a violation of his

---

[20] See DE #150, p. 4.

Indiana constitutional rights, such claims cannot be maintained because Indiana courts have not recognized an implied right of action for civil damages under the Indiana Constitution. Plaintiff has not responded to this argument. The only section of the Indiana Constitution that Plaintiff cites to in his complaint provides:

> [t]hat all people are created equal; that they are endowed by their CREATOR with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness; that all power is inherent in the People; and that all free governments are, and of right ought to be, founded on their authority, and instituted for their peace, safety, and well-being. For the advancement of these ends, the People have, at all times, an indefeasible right to alter and reform their government.

Ind. Const. art. I, § 1. Based on the allegations in the second amended complaint that focus on Defendants' use of excessive force, it is more likely that Plaintiff may be attempting to bring claims pursuant to Article I, Section 15, which mandates that "[n]o person arrested, or confined in jail, shall be treated with unnecessary rigor." Ind. Const. art. I, § 15. Either way, Indiana has yet to recognize a civil remedy for such violations. *Ball v. City of Indianapolis*, 760 F.3d 636, 645 (7th Cir. 2014); see also *Smith v. Indiana Dept. of Correction*, 871 N.E.2d 975, 985 (Ind. App. 2007) ("no Indiana court has explicitly recognized a private right of action for monetary damages under the Indiana Constitution").

Courts in this district have generally agreed that "recognizing an implied right of action is a step to be taken, if at all, by the Indiana courts and not the federal courts." See *Greater Indianapolis Chapter of N.A.A.C.P. v. Ballard*, 741 F. Supp. 2d 925, 934 (S.D. Ind. 2010) (collecting cases). This Court agrees. Moreover, even if such a remedy does exist, it is clear that Plaintiff has not presented any evidence that Defendants would be liable for damages in this situation. As stated by the Indiana Supreme Court:

> [c]ases recognizing violations of Article 1, Section 15 involve situations where a prisoner was tortured, had a tooth knocked out, was repeatedly beaten, kicked, and struck with a blackjack and beaten with a rubber hose while he was stretched across a table, *Kokenes v. State,* 213 Ind. 476, 13 N.E.2d 524 (1938), where a prisoner was beaten with police officer's fists in both eyes, cut on the top of his head, and beaten with a rubber hose on the head and ears, *Bonahoon v. State,* 203 Ind. 51, 178 N.E. 570 (1931), and where a prisoner was severely injured after being shot by police during a protest, *Roberts v. State,* 159 Ind. App. 456, 307 N.E.2d 501 (1974). Ratliff's treatment in prison, as asserted in her complaint, does not rise to the level of the "unnecessary rigor" contemplated by Article 1, Section 15. Ratliff's complaint has not stated a claim under Article 1, Section 15 upon which relief can be granted.

*Ratliff v. Cohn*, 693 N.E.2d 530, 541 (Ind. 1998). For the reasons set forth in detail above, the force used by Defendants during the encounter with Plaintiff at the Courts was objectively reasonable

and did not rise to the level of "unnecessary rigor" prohibited by Article 1, Section 15. Thus, Plaintiff cannot succeed on a claim premised on the Indiana Constitution and summary judgment is appropriate.

CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment (DE #164) is **GRANTED**. The clerk is **DIRECTED** to close this case.

**ENTERED: October 12, 2017**        **/s/RUDY LOZANO, Judge**
                                       **United States District Court**